```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------X

CRAIG BEEM a/k/a CRAIG JEFFERIES and
CKB ADVISORS LLC,

                        Plaintiffs,            14 Civ. 2632

    -against-                                  OPINION

NOBLE AMERICAS CORPORATION and NOBLE
GROUP LIMITED,

                        Defendants.

-------------------------------------------X
```



A P P E A R A N C E S:

    Attorneys for Plaintiffs

    MCMENAMIN LAW GROUP
    555 Fifth Avenue, 11th Floor
    New York, NY 10017
    By:  Paul R. McMenamin, Esq.


    Attorneys for Defendants

    MINTZ, LEVIN, COHN, FERRIS, GLOVSKY & POPEO, P.C.
    666 Third Avenue
    New York, NY 10017
    By:  Andrew J. Bernstein, Esq.
        Jessica W. Catlow, Esq.

**Sweet, D. J.**

Defendant Noble Americas Corporation ("Noble Americas") has moved to dismiss the Amended Complaint ("AC") of plaintiffs Craig Beem a/k/a Craig Jefferies ("Beem") and CKB Advisors LLC ("CKB," together with Beem, the "Plaintiffs") as to the hiring of Mark Towson ("Towson") pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure ("FRCP"). Defendant Noble Group Limited ("Noble Group," together with Noble Americas, "Defendants") has moved to dismiss the AC pursuant to Rules 12(b)(2) and 12(b)(5) of the FRCP. Based on the conclusions set forth below, Noble Americas' motion to dismiss Counts I and III in their entirety, and II, as to the hiring of Towson, is granted for failure to state a claim and Noble Group's motion to dismiss the AC in its entirety is granted for lack of service.

**Prior Proceedings**

This action was commenced in the Supreme Court of the State of New York on March 7, 2014 and removed to this Court on April 14, 2014. The AC was filed on May 5, 2014.

1

The AC contains the following allegations:

Plaintiffs are residents and domiciled in the State of New York. Noble Group is a publically traded global supply chain conglomerate covering agricultural and energy products that operates in over 140 countries including throughout parts of North America with its main United States office "Noble Americas Corporation" located at Four Stamford Plaza 107 Elm Street Stamford, Connecticut 06902. (See AC ¶ 2.) Noble Group is a corporation organized under the laws of Bermuda with its principal place of business and offices located at 18th Floor, Mass Mutual Tower 38 Gloucester Road, Hong Kong, China and, upon information and belief, is the parent company of Noble Americas Corporation. (Id.)

The Search and Recruitment Agreement ("Agreement") between CKB and Noble Americas was negotiated by and among the parties in New York on August 14, 2012, Plaintiffs' services were substantially performed in New York, and the Agreement provides that the parties, including Noble Americas and "any of its subsidiaries," shall ". . . submit to the non-exclusive jurisdiction of the New York courts to resolve any disputes, claims or actions thereunder." (AC ¶ 3, Ex. B. § 10(f).) Noble

Group directly "solicited Plaintiffs' recruitment services independent and apart from the Agreement as detailed in the [AC]." (See AC ¶ 3.)

Noble Americas' "corporate letterhead" describes itself as "a member of the Noble Group," and shares the identical website of Noble Group (www.thisisnoble.com). Noble Americas also uses the same identifying "logo" that Noble Group commercially exploits in the conduct of its business worldwide. (See AC ¶¶ 5-6.)

During all the relevant times in question, Yusuf Alireza ("Alireza") served as the Chief Executive Officer of Noble Group, and was Plaintiffs' primary interface associated with the search assignments that Plaintiffs were engaged to perform on behalf of Noble Group. (AC ¶ 7.) During the relevant period in question, Paula Wearmouth ("Wearmouth"), served as the direct personal assistant to Alireza and, in that capacity would on behalf of Alireza coordinate the conferences, interviews and meetings respecting prospective candidates that Plaintiffs' introduced to Noble Group at Noble Group's and Alireza's express solicitation, instruction and consent which, Plaintiffs contend, constitutes an implied and enforceable

3

enforceable agreement directly with Noble Group and Plaintiffs apart from the Agreement. (AC ¶ 8.)

Plaintiffs contend that they are entitled to an executive placement commission that is immediately due and owing in an amount totaling at least two hundred thousand dollars ($200,000.00) respecting Plaintiffs' "solicited" introduction of several potential candidates for the position of "Global Head of Human Resources ("Global Head of HR") at Noble Group; specifically Plaintiffs' successful placement of Towson as Global Head of HR on behalf of Noble Group. (AC ¶ 9, Ex. A.)

Plaintiffs contend that their "solicited" introduction of Towson to Noble Group ultimately resulted in the successful placement by Plaintiffs of Towson, as Global Head of HR at Noble Group. (AC ¶ 10.) The AC alleges documentary evidence between Plaintiffs, Towson, Wearmouth, Alireza and Noble Group commencing in November 2012 and continuing through late January 2013 that Plaintiffs contend establishes a ratification of the Agreement and, a direct contractual relationship with Noble Group notwithstanding the Agreement that entitles Plaintiffs, as a matter of law, to an executive placement fee in the event Defendants and Towson successfully concluded an employment

arrangement with Towson, which occurred in early June 2013. (AC ¶ 11.)

The Agreement provides in Section 3 that, "Noble will award candidate ownership to the Consultant that first presents a candidate's CV to Noble HR personnel for whom recruitment has been solicited for a particular search." (AC ¶ 12, Ex. B § 3.) Noble Americas charged Plaintiffs, on a non-exclusive basis, with the recruitment search for the Global head of HR position.

Notwithstanding the Agreement between Noble Americas and Plaintiffs, Plaintiffs contend that the office of the Chief Executive Officer of Noble Group, Alireza, actively and directly "solicited" Plaintiffs for the particular search assignment for qualified candidates to consider for the Global Head of HR position in November 2012. (AC ¶ 14.) At that time, Alireza's office at Noble Group engaged Plaintiffs' directly, via e-mail from Alireza's personal assistant, Wearmouth, for the particular recruitment search to secure a new Global Head of HR, since the individual who had previously held the post departed the firm on or about October 30, 2012. (AC ¶ 15.)

The former human resources associate, Leila Konyn, referred Plaintiffs to Alireza's office via Wearmouth in late summer 2012 to coordinate interviews for potential candidates for senior positions prior to her departure, and as described herein, this avenue of communication with Noble Group continued into January 2013. (AC ¶ 16, Ex. C.)

Plaintiffs contend that Wearmouth also confirmed Noble Group's interest in two additional candidates presented by Plaintiffs to Noble for other positions at the Company that Alireza's office had "solicited" to Plaintiffs. (AC ¶ 19.)

On December 19, 2012, Plaintiffs responded to Wearmouth's request with a list of potential candidates in order to schedule interviews with Alireza for the Global Head of HR position that included Towson and JJ Thakkar. Plaintiffs continued the conversation with Wearmouth regarding two additional applicants, Trey Griggs and Adam Glassman, for other positions for which Plaintiffs had been "solicited" directly by Noble Group. (AC ¶ 20.)

On December 26, 2012, Wearmouth contacted Plaintiffs and Towson directly to confirm an interview with Alireza for Monday, January 14, 2013.  (AC ¶ 21.)

E-mail correspondence between Plaintiffs and Towson, beginning in November 2012 and continuing through January 2013, discussed, among other things, the position and the scheduling of interview dates that Plaintiffs, on Towson's behalf, were setting up associated with the Global Head of HR position at Noble Group.  (AC ¶ 22.)  Despite Plaintiffs' efforts to place Towson with Noble as Global Head of HR, on January 11, 2013, Plaintiffs were advised by Noble Group that Towson's scheduled interview with the Chief Executive Officer of Noble Group to be held at Noble Group's Noble Americas' office would be put on hold since, according to Noble Group, Alireza was in the final stages of interviewing another candidate for the Global Head of HR position.  (AC ¶ 23.)

On January 11, 2012, Plaintiffs' advised Towson of this development, and advised that Plaintiffs' would inform Towson in the event that the Global Head of HR position opened up.  On January 12, 2012, Towson responded to Plaintiff stating,

"Sorry to hear that but I remain interested if it doesn't work out with the other candidate." (AC ¶ 24.)

Sometime afterward, Plaintiffs learned that Towson accepted the position and began his role as Global Head of HR at Noble Group and stated that a purported search firm "Omerta" was the actual source of introduction to Noble Group prior to Plaintiffs' involvement, which Towson suggested began sometime in November 2012. (AC ¶ 25.)

As the Global Head of HR position is very senior, and as the position is physically located in Hong Kong, China, it would require extensive and on-site interviews by employees of Noble Group, and further, upon securing the particular position with Noble Group, that Towson relocate to Hong Kong, China from Houston, Texas, which he communicated that he was willing to do. (AC ¶ 26.)

Plaintiffs contend that despite Towson commencing his position at some time in June 2013, the timeline demands that Noble Group engaged talks with Towson sometime in February or March 2013. Plaintiffs also contend that Noble Group's solicitation of Plaintiffs, as described herein, constitutes a

legal "ratification" by Noble Group and Alireza associated with the recruitment of a candidate for this particular Global Head of HR position through Alireza's office, and thus Plaintiffs are entitled to the related commission. (AC ¶ 27.)

Plaintiffs further contend that "the evidence contradicts Towson's unsubstantiated and patently untrue claim that another search group, 'Omerta' was the source of introduction to Noble Group." (AC ¶ 28.) Plaintiffs also allege that this conduct on Towson's, Noble's, and Alireza's part "amounts to nothing more than a pure fabrication that has and continues to cause damage to Plaintiffs." (AC ¶ 30.)

Following Noble Group putting "a hold" on the interview process with Towson in January 2013, these interview discussions, unbeknownst to Plaintiffs, resumed, upon information and belief, sometime in February or March 2013, which interview process led to the successful placement of Towson as Global Head of HR at Noble Group. (AC ¶ 31.) Plaintiffs contend that Noble Group is liable to immediately pay the placement fee in excess of $200,000 to Plaintiffs. (AC ¶ 32.)

legal "ratification" by Noble Group and Alireza associated with the recruitment of a candidate for this particular Global Head of HR position through Alireza's office, and thus Plaintiffs are entitled to the related commission. (AC ¶ 27.)

Plaintiffs further contend that "the evidence contradicts Towson's unsubstantiated and patently untrue claim that another search group, 'Omerta' was the source of introduction to Noble Group." (AC ¶ 28.) Plaintiffs also allege that this conduct on Towson's, Noble's, and Alireza's part "amounts to nothing more than a pure fabrication that has and continues to cause damage to Plaintiffs." (AC ¶ 30.)

Following Noble Group putting "a hold" on the interview process with Towson in January 2013, these interview discussions, unbeknownst to Plaintiffs, resumed, upon information and belief, sometime in February or March 2013, which interview process led to the successful placement of Towson as Global Head of HR at Noble Group. (AC ¶ 31.) Plaintiffs contend that Noble Group is liable to immediately pay the placement fee in excess of $200,000 to Plaintiffs. (AC ¶ 32.)

The instant motions were marked fully submitted on July 16, 2014.

**Applicable Standard**

Rule 12(b)(2) requires that courts dismiss a claim if they do not have personal jurisdiction over the defendant. See Fed. R. Civ. P. 12(b)(2). "To establish personal jurisdiction, [a plaintiff] must show that [the defendant] has minimum contacts with the forum state and was properly served." Salmassi e. Kfr. v. Euro-America Container Line Ltd., No. 08 Civ. 4892, 2010 WL 2194827, *4 (S.D.N.Y. June 1, 2010) (citations omitted). Once a defendant has raised a jurisdictional defense on a Rule 12(b) motion to dismiss, the plaintiff bears the burden of establishing that the court has jurisdiction over a defendant. DiStefano v. Carozzi N. Am. Inc., 286 F.3d 81, 84 (2d Cir. 2001) (citations omitted).

Pursuant to Rule 12(b)(5), "a complaint may be dismissed for insufficient service of process." Weston Funding, LLC v. Consorcio G Grupo Dina, S.A. de C.V., 451 F. Supp. 2d 585, 589 (S.D.N.Y. 2006) (citations omitted); see also Hawthorne v. Citicorp Data Sys., Inc., 219 F.R.D. 47, 49 (E.D.N.Y. 2003)

("Without proper service a court has no personal jurisdiction over a defendant."). On such jurisdictional matters, the plaintiff bears the burden of proof. See Commer v. McEntee, 283 F. Supp. 2d 993, 997 (S.D.N.Y. 2003) ("Once a defendant challenges the sufficiency of service of process, the burden of proof is on the plaintiff to show the adequacy of service."). To meet this burden, the plaintiff must show proper service "through specific factual allegations and any supporting materials." Rankel v. Town of Somers, 999 F. Supp. 2d 527, 536 (S.D.N.Y. 2014). In resolving a Rule 12(b)(5) motion to dismiss for insufficient service of process, "a Court must look to matters outside the complaint to determine whether it has jurisdiction." Mende v. Milestone Technology, Inc., 269 F. Supp. 2d 246, 251 (S.D.N.Y. 2003) (citations omitted).

On a motion to dismiss pursuant to Rule 12(b)(6), all factual allegations in the complaint are accepted as true, and all inferences are drawn in favor of the pleader. Mills v. Polar Molecular Corp., 12 F.3d 1170, 1174 (2d Cir. 1993). However, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

A claim is facially plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 663 (quoting Twombly, 550 U.S. at 556). In other words, the factual allegations must "possess enough heft to show that the pleader is entitled to relief." Twombly, 550 U.S. at 557 (internal quotation marks omitted).

**Service Upon Noble Group Has Not Been Established**

Under New York law, in order to properly serve Noble Group, a foreign corporation, Plaintiffs must deliver the summons by personal delivery upon a director or officer of Noble Group, or any other agent authorized by appointment of law. Fed. R. Civ. P. 4(e)(1); CPLR § 311(a). Service upon a subsidiary of a foreign corporation does not constitute sufficient service of process. See Giar v. Centea, A Div. of KBC Bank, NV, No. 02 Civ. 7916, 2003 WL 1900836, *2 (S.D.N.Y. Apr. 16, 2003) ("It is hornbook law that service of process on a subsidiary does not constitute service on a parent corporation,

12

nor does service on a parent constitute service on a subsidiary.") (citations omitted).

Plaintiffs caused the AC to be served upon Noble Americas by delivering it by hand to Brian Theodore ("Theodore"), a contract attorney for Noble Americas at Noble Americas' offices in Connecticut. (Limone Decl. ¶ 9.) Theodore is not an officer, director, employee or agent of Noble Group, and is not authorized to accept service of process on behalf of Noble Group. (Id. ¶ 10.) Plaintiffs, by their own admission, have not yet otherwise served the AC upon Noble Group. (See Pls.' Opp'n 19; see also Sundavadra Decl. ¶ 12.)[1]

Because Plaintiffs have failed to effectuate service upon Noble Group, the AC is dismissed in its entirety pursuant to FRCP 12(b)(5). Accordingly, a 12(b)(2) analysis as to whether this Court properly exercises personal jurisdiction over Noble Group is not entered into at this time.

**Counts I and III of the AC Against Noble Americas Are Dismissed**

---

[1] Additionally, Plaintiffs have not served the AC upon the New York Secretary of State. (See generally AC.) Plaintiffs may serve the AC upon the New York Secretary of State only if the Court may exercise personal jurisdiction over Noble Group which, Noble Group contends, is not the case. CPLR § 311(a); NY BCL § 307(a).

13

Plaintiffs allege that Noble Americas "never had any intention to compensate Plaintiffs for the search and recruitment services Plaintiffs provided but nevertheless 'lured' Plaintiffs into performing recruitment services . . . ." (AC ¶ 1.) Plaintiffs further allege that the emails and other documentary evidence between November 2012 and January 2013 "establishes a clear and unequivocal contractual relationship that unequivocally entitles Plaintiffs, as a matter of law, to an executive placement fee in the event that Noble and Towson successfully concluded an employment arrangement with Towson . . . . " (AC ¶ 11.) Similarly, Plaintiffs also allege that, with respect to Noble Group's hiring of Robert Fuller, "a clear and unequivocal contractual relationship exists that unequivocally entitles Plaintiffs, as a matter of law, to an executive placement fee in the event that Noble Group successfully concluded an employment arrangement with Fuller . . . ." (AC ¶ 36.)

In order to properly state a claim for fraudulent inducement, Plaintiffs must allege either (1) a legal duty separate from the duty to perform under the contract, (2) a fraudulent misrepresentation collateral or extraneous to the

14

contract, or (3) special damages that are caused by the misrepresentation and unreasonable as contract damages. Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc., 98 F.3d 13, 20 (2d Cir. 1996). Plaintiffs have claimed that Noble Americas "lured" Plaintiffs into believing it would pay for the recruitment services, but had no intention to pay for them, which is insufficient to support a claim of fraudulent inducement. (AC ¶ 1); see also Telecom Int'l America, Ltd. v. AT&T Corp., 280 F.3d 175, 196 (2d Cir. 2001) ("Simply dressing up a breach of contract claim by further alleging that the promisor had no intention, at the time of the contract's making, to perform its obligations thereunder, is insufficient to state an independent tort claim.") (citations omitted). Such an allegation is not collateral or extraneous to the breach of contract claim. See Bridgestone/Firestone, 98 F.3d at 20 (claims for fraud in the inducement are duplicative of a breach of contract claim when they are premised upon breach of contractual duties and the supporting allegations do not contain representations which are collateral to the terms of the contract) (internal citations omitted); NCA Holding Corp. v. Ernestus, No. 97 Civ. 1372, 1999 WL 672836, *2 (E.D.N.Y. Aug. 27, 1999) (although New York recognizes a claim for fraud in the inducement of contract, the claim cannot be based solely upon

the failure to perform); Astroworks, Inc. v. Astroexhibit, Inc., 257 F. Supp. 2d 609, 616 (S.D.N.Y. 2003) ("a contract action cannot be converted to one for fraud merely by alleging that the contracting party did not meet its contractual obligations") (citations omitted).

In order to state a claim for breach of the implied covenant of good faith and fair dealing, Plaintiffs must allege an implied duty consistent with the terms of the Agreement that was breached based on conduct by Noble Americas that subverts the Agreement's purpose distinct from its obligations to pay for Plaintiffs' services. JPMorgan Chase Bank, N.A. v. The IDW Group, LLC, No. 08 Civ. 9116, 2009 U.S. Dist. LEXIS 9207, *16 (S.D.N.Y. Feb. 9, 2009). "New York law . . . does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." Harris v. Provident Life and Accident Ins. Co., 310 F.3d 73, 81 (2d Cir. 2002).

Like the claim for fraudulent inducement, Plaintiffs' claim for breach of the contractual implied covenant of good faith and fair dealing does not contain any factual allegations distinct from Plaintiffs' claim that Noble Americas breached the

Agreement. Plaintiffs allege only "Defendant's [sic] violated their obligations of good faith and fair dealing under the Agreement by virtue of the wrongful refusal to compensate Plaintiff for services rendered." (AC ¶ 49.) These allegations are redundant of Plaintiffs' allegations regarding breach of the Agreement. Count III of the Plaintiffs' AC is therefore subject to dismissal. Cruz v. FXDirectDealer, LLC, 720 F.3d 115, 125 (2d Cir. 2013) ("[W]hen a complaint alleges both a breach of contract and a breach of the implied covenant of good faith and fair dealing based on the same facts, the latter claim should be dismissed as redundant.") (internal citation omitted).[2]

Because Plaintiffs' claims for fraud in the inducement and breach of the duty of good faith and fair dealing are duplicative of Plaintiffs' claim that Noble Americas breached the Agreement, Claims I and III are dismissed for failure to state a claim.

**Count II Of The AC As It Relates To The Hiring Of Towson Is Dismissed**

---

[2] Plaintiffs contend that Noble Americas' focus "on the Agreement as the purposes sole basis upon which Plaintiffs' seek recovery . . . is flatly wrong." (Pls.' Opp'n 21.) However, neither the AC nor the Plaintiffs' opposition papers clearly alleges representations made by the Defendants which can be fairly construed as collateral to the contractual arrangement for recruitment services.

The AC alleges that Noble Group hired Towson as its Global Head of HR in June 2013 and, with respect to that hiring, that Plaintiffs' "'solicited' introduction of Towson to Noble Group Limited is clear." (AC page 4, ¶ 11.) The Agreement requires Noble Americas to pay to CKB a placement fee for its "successful placement of a candidate" at Noble Americas and its subsidiaries. (AC Ex. B.) However, the AC does not allege that Noble Group is a subsidiary of Noble Americas; in fact, it alleges the reverse – that Noble Americas is a subsidiary of Noble Group, and not the other way around. (See AC ¶¶ 2 ("Noble Group Limited . . . upon information and belief, is the parent company of Noble Americas Corporation") and 6 ("Noble Americas Corporation is, upon information and belief, a 'member of Noble' and the North American subsidiary of Noble Group Limited").) As such, accepting the allegations set forth in the AC as true, by the Agreement's own terms, Noble Americas would be under no obligation to pay for any individuals introduced by Plaintiffs and hired by Noble Group. Therefore, Plaintiffs fail to state a claim for breach of contract against Noble Americas. Harsco Corp. v. Segui, 91 F.3d 337, 348 (2d Cir. 1996) (in order to state a claim for breach of contract, plaintiff must allege facts constituting a breach of contract by defendant).

**Conclusion**

For the reasons set forth above, Defendant Noble Americas' motion to dismiss Counts I and III, and Count II, as to the hiring of Towson, of the AC is granted. Defendant Noble Group's motion to dismiss the AC in its entirety is granted.

New York, NY
October 16, 2014

_____
ROBERT W. SWEET
U.S.D.J.

19